We have for the appellate, Rachel Murphy, and for the appellee, Lorelei Burkett. Oh, I apologize to you. Justice Steigman will not be here. He will be listening to the recording afterwards. He's out. Good morning, Your Honors. May it please the Court and Counsel. Rachel Murphy, Assistant Attorney General, appearing on behalf of the appellants, the Illinois Department of Revenue, and Director Hamer. Your Honors, the plain language of Sections 213 and 214 of the Property Tax Extension Limitation Law establishes that the only way the Auburn District can remove the tax limitations that were imposed by referendum is through another referendum. Annexation of territory in another county is not a basis for removing TEL. And to the extent the Court finds the statutory scheme to be ambiguous, it should adopt the Department's reasonable interpretation, which furthers the legislative intent of giving taxpayers greater control over their property taxes. Well, how are we supposed to defer to the Department when they refuse to issue an opinion? The Department's interpretation is the one that has always advanced. It did not issue a formal opinion. But its opinion is in the letter that was... Was that an opinion? If it's not an opinion, it's not an opinion. It was not a formal opinion, Your Honor. Why would that be? I thought that was the Department's job to make that determination. At the time, the Department reviewed the statute and determined that because this exact scenario was not discussed in the statute, that it did not want to issue a formal opinion. But it has always been the Department's view that Section 214 is an operative section and that because the situation here isn't encompassed in the revocation provisions in Section 214, that the Auburn District cannot revoke TEL. Well, let me ask the question a different way. Excuse me. Is this the only school district in the state of Illinois where this has happened? That I am aware of, Your Honor. Yes. Okay. So starting, before even talking about deferring to the Department's interpretation, you don't even need to get to that point because the plain language of the statute is all the Court needs to look at. Although the scheme is a bit complicated, our argument is simple. Section 213 governs the initial imposition of tax limitations on a taxing district through a referendum. It does not provide for later reevaluation or removal of TEL because of a change in the district circumstances. Rather, the only way to remove limitations from a district that became subject to the law under Section 213 is for the voters to rescind it pursuant to a revocation referendum under Section 214. Well, I don't think it's all that clear. I don't think this situation is covered by either statutory section. And how can the Board or how can the district ask to impose a P-TEL on the citizens of Montgomery County who have never held a referendum? The district is the same district that has always existed. And that district at the time was only in Sangamon County. So the annexation of the small amount of territory in Montgomery County, it's not a trigger for reevaluating. The citizens of Montgomery County, that portion was annexed onto a district that was subject to P-TEL. And that's the end of the matter. There's no provision for reevaluating whether that district remains subject to P-TEL because of annexation of territory. If this district had existed as a multi-county district in 1996, that would be a different situation. But the operative moment that you determine whether to apply P-TEL is the initial imposition of P-TEL. At that time Montgomery County was not involved. And so what happened is the regional board annexed territory onto an existing district that was subject to P-TEL. And so that portion of Montgomery County takes those conditions as they were when the annexation happened. And what's your authority for that? That comes from section 214, which says, specifically I'm looking at subsection B, defines a taxing district for purposes of section 214 to mean any non-home rule taxing district that became subject to this law under section 18-213 of this law. So here, under the plain language, you have a district that became subject to P-TEL under section 213. There's no dispute about that. Well, except it's a different taxing district. It's got additional property in it. That to me says that this section doesn't apply to Montgomery County's property. It's not a different taxing district. It is the same district. It is still the Auburn Community Unit District Number 10. But this property in question was never subject to a referendum. And that's required for 214 to apply. That's not required for 214 to apply. All that's required for 214 to apply is that you have a district that became subject to section 213 pursuant to a referendum. And that's what we have here. There's no statement in section 213 or section 214 that if the district changes boundaries, we're going to re-evaluate its status. What it says is, if you have an existing district that became subject to the law, the only way you can remove P-TEL is through the revocation referendum. And so you would have a different situation if a new district were created today. If the regional board had said, we're going to dissolve the Auburn district, and we're dissolving the Divernon district, and we're creating an entirely new district, that would be a different situation. Because then you wouldn't have a district that became subject to the law under section 213. And under what circumstance would they do that? Would it have to be a massive annexation? I don't know in what situation a regional board would decide to dissolve two districts and create a new one, as opposed to annexation. The school code and the revenue code are both very, very, very particular. They envision just about every circumstance but this one. I disagree, Your Honor. I think that this is envisioned in the sense that what the legislature said is, the only way you can revoke P-TEL is through a referendum. And there are also other ways. The Auburn district, its hands are not tied. P-TEL itself provides for ways that it can raise revenue, that it can increase its extension limitation beyond what the limits are. Again, by having a referendum. There's the three different sections, section 190, 205, and 212. And they all would allow the district itself to go to the voters and say, we'd like to increase the limiting rate, or we'd like to issue a new bond. We'd like to increase the extension limitation beyond the consumer price index. We'd like to increase our debt service extension base. So they can go and ask to raise more money than would otherwise be provided for. It's just that they have to ask. And they can't simply get out from the P-TEL limitations through this annexation of territory. So I think that the language of the statute is clear. And because this situation is not provided as a basis for revocation, and you have an existing district that continues to exist, then you have to look at section 214 and the revocation referendum. And as I said at the beginning, to the extent that there are two equally reasonable options, two equal interpretations of the scheme here, it is the department's interpretation that furthers the legislative intent of giving taxpayers greater control over keeping a limit on their property tax increases. And in contrast, the board's interpretation adds a revocation provision to section 214 that isn't there. And it also would stymie the will of the voters in Sangamon County who said they want this district to be subject to the P-TEL limitations. Unless the court has further questions? What is the amount of revenue we're talking about for this district? I don't know, Your Honor. I'm afraid that's a question I think counsel for the board would be better prepared to answer. So what is it that the board has to do in this circumstance? They asked for an opinion from revenue. Revenue refused to give them an opinion. They apparently chose to seek legal regress. And now the board wants to stand on the letter that says we're not going to give you an opinion. Well, the department is not simply standing on its letter. I mean, we have also advanced the same position in this litigation. The letter does say that it is the department's view from looking at sections 213 and 214 that there is no revocation of P-TEL under these circumstances. As well as the plain language, the department cited the legislative intent, the fact that the amount of territory in Montgomery County is so small. And so the department did give its view. That's not a binding opinion for the board to rely on. I mean, this litigation has been going on for quite a while and cost Auburn quite a lot of money in the state. Yes, Your Honor. There was no formal opinion. Do they do that very often? I don't know. I can't speak to that. In this situation, because this exact scenario was not laid out in the statute, I think that's the reason that the department was hesitant to issue a formal opinion. But it has always advanced the view that P-TEL has not been revoked. In this situation, the board could have then immediately gone to the voters and said, either we'd like to raise the limit, we'd like to raise the limitation on the extension, or gone to the counties and said, Sangamon County hold a revocation referendum, Montgomery County hold a referendum. So there are ways that the board can proceed, again, by going to the voters. I think the point of the question, though, is, you know, had the department been a little bit more proactive in terms of putting out their interpretation of how this situation should be resolved, everybody could have been saved. Potentially a lot of work and effort and trial and tribulation, and perhaps that's the message you can take back to the department. I hear that, Your Honor. I understand the point. Thank you. For these reasons, we ask that you reverse. Thank you. Ms. Burkett, did I mispronounce your first name? Yes, Your Honor. I apologize. I know better. Your Honors, good morning. I'm ahead of myself, counsel. As you know, I'm here for the Board of Education of the Auburn School District. The department is now offering what it terms a reasonable interpretation of Section 18, 213, and 214 of P-TEL. As Your Honors noted, this is a very recent interpretation. Section 214 was given very short shrift in the letter, the guidance letter, and in the motion for summary judgment below. It's not a product of department deliberation. It's not a rule or regulation. It's a product of disappeal. It is a product of good lawyering. It is not a product of a department deliberation. Is it unusual that the clerk actually issued the letter that the clerk issued? I think that was entirely reasonable. But, I mean, usually isn't there some... There really aren't any. There are no processes for the situation in which Auburn finds itself. In answer to an earlier question, Your Honor, you asked about, you know, what would happen if they dissolved both of them. The school code provides that if in a district it has a population of less than 5,000, it shall be dissolved. Auburn had no choice in the fact of Divernon being dissolved. It had to be dissolved according to the school code. The EAB in the entire district is about $93,000. 22,500, or 22,000,000, 22,000,000 of that comes from the Divernon district. So this is not a small amount of EAB we're talking about. But regardless, Patel doesn't talk about large or small amounts of EAB. It says any EAB. And we made that point. The department's interpretation is that once Patel applies, it applies until the voter says it no longer applies. The Sangamon County voters said it applies, so it does. The only way it can't apply is for those voters to revoke it by the will of the majority. And that, the department says, goes to the purpose of the statute, which is voter participation and voter transparency. The problem with it is it doesn't match to the language used by the legislature. The department offers this solution to the conundrum that's presented by a district becoming a taxing district that has property EAB in two counties, one of which has never held a referendum. And that is, well, the voters of Sangamon County can go out and hold a 214 referendum and reject, or vote to remove Patel. And then voters of Montgomery County can go and have a referendum under 213 and reject Patel. Problem solved. And because this scenario would fit into the language, the department concludes Patel applies. The department doesn't tell us what to do if there's a scenario as follows, which is equally as likely. Sangamon County voters hold a 214 referendum and vote to remove Patel. Montgomery County voters do nothing. Is Patel revoked? Not according to the language of 214G1I, the little i's, which applies to the removal of Patel in taxing districts that have EAB in more than one county. That section requires that each of the counties with any EAB have held a referendum of one of the two kinds. So Patel does not magically apply just because we can come up with a scenario that would work. There are plenty of scenarios where it would not work. The will of Sangamon County voters there is not done. Sangamon County, even though they put Patel into effect, could not, under that scenario, remove it. Even though they comprise the majority of the people, they couldn't remove it. Even though they have most of the EAB, they couldn't remove it. And the reason they can't remove it is because of the plain unambiguous language used by the legislature in 214G1I, which requires two referendums, one in each of the counties. If there were even more counties, we'd have to have more referendums. But that skips ahead to section 214. If we go back to 213, which is the statute that governs the application of Patel in taxing districts that are located in more than one county, have EAB in more than one county, Patel will apply if each county with any EAB has held a referendum under 213. Auburn School District is not such a district. I'm sorry, which section were you reading from? That would be in section 213, Your Honor. Which section of 213? Oh, sure. Okay. And this is the one that gets difficult to read because they refer so often to the excluded counties. It would be in C, in which any of the equalized, yeah, each county in which any of the equalized assessed valuation is located has held a referendum under this election, or under this section. And that hasn't happened. Montgomery County has never held any referendum under Patel. So, what we're left with is that the plain language of section 213 that governs the applicability of Patel to a taxing district doesn't fit Auburn School District. Well, except what it says in the beginning under 2, with respect to taxing districts that meet all the following, this law shall become applicable to the taxing district beginning January 1, 1997. Now, that happened. That did happen. It doesn't say, and if subsequently property is annexed, which is not subject to 213, That's true, Your Honor. It doesn't say anything. The legislature didn't address it. And it is not up to the courts to fill in the blanks. And that's what the department would like this court to do. Well, so why can't we just, I mean, you're asking us to fill in the blanks. As much as she is. Why can't we just leave it as it is? It applies to Sangamon County. It doesn't apply to Montgomery County. Because that's not the taxing district. The taxing district has EAV in both counties. And it's either a Battelle taxing district, subject to the limitations, or it is not. And according to the plain language of the statute, it is not. And Auburn finds itself in a position where it has this property annexed to it, which has serious health, safety, and life concerns, that's going to need serious money to fix, and it can't get bond counsel opinion, even though the Sangamon County clerk has treated it as not being Battelle any longer because it doesn't fit within the statute. It also can't get a decision from the department. There's no doubt you've done everything you needed to do, and you're not at fault here. But I cannot find the language in the statute that says that the Battelle has to be applied to Montgomery County. And that's right, Your Honor, that's what I'm saying. That because now this taxing district is a tax, and it's, when you go into 213 and 214, it starts with taxing districts as a whole, and then it breaks down into taxing districts with EAV in more than one county. That's the more specific, and that controls. And Auburn is now a taxing district with EAV in more than one county. In those circumstances, because it's not just the Sangamon County voters that get a say in this, in those circumstances, each of the counties has to have held a referendum. And that's not the circumstance in which we find ourselves. The legislature and the department said this early on. The legislature hasn't, I don't know if they didn't think of this, but they certainly haven't addressed it. And as the court below said, I'm not here to fill in the loopholes. And there is a hole here. My question is much more parochial. And it's been a long time since I represented school districts, but I did back a long time ago. That's when I first met? I bet. But it seems to me that the Board of Education extends a levy, and being Auburn, they're subject to PTEL. And they extend the levy, the same levy that covers the Sangamon County ground and the Montgomery County ground. What is the practical effect of PTEL when Montgomery hasn't spoken to PTEL at all? They just pay the levy, or they pay the taxes based on the levy. But they haven't, because after the annexation, PTEL has not been applied. But if they did apply it, as the state thinks should have been done, what's the practical effect to Montgomery County? The practical effect to the district as a whole is that they can't get the bond they need in order to do all the life safety health improvements that are required subsequent to the annexation. So the schools aren't going to be brought up to the requirements of the Illinois State Board of Education. So several years, Montgomery County has had a different tax than Sangamon County and the Auburn District? No. PTEL has not been applied to Auburn District as a whole since this annexation. Because of the letter from the clerk? Right. So why can't you just go to Montgomery County and have a referendum in Montgomery County? To have a referendum to reject PTEL? Whether to accept or reject. But it's not up to the district to... PTEL works, it's the county board that decides whether or not there is a PTEL referendum, not a local taxing district. So Auburn School District has no authority to go to the voters and say, we're going to put this on the ballot. You could go to the county board just like you went to the county clerk. You could go to the county board. Obviously it's not in the best interest of the taxing district to have PTEL rejected. Or to have a PTEL referendum. Well even if you had a referendum in Montgomery County and it was rejected, would it have any effect then on the district? Then it would fit into, I don't know if it would fit into 213 because it didn't happen at the time of 213. That's the problem. There just is no guidance from the legislature. There's no guidance from anyone. And bond counsel is, let's just say, squeamish. Yes, that's their job. That's certainly true. Until the time comes to submit their bills. They're not so squeamish. We've noticed that. So our position is that because the legislature didn't address this. And this is a legislative problem. Not a school district problem. Not a court's problem. This is their problem. And they have to fix it. And until that time, the plain language of PTEL just doesn't apply to this district as it is now configured. And we ask the court to affirm the judgment below. Thank you, Ms. Burkett. Ms. Murphy? What would happen if Montgomery County were to reject in a referendum right now? It would not have any effect on the Auburn district. In our view. Because the Auburn district is currently subject to PTEL. And so for the Montgomery voters to now hold a referendum, yea or nay, would not affect a district that already has become subject to PTEL. There's one operative moment for Section 213's application. And that is at the initial determination of whether PTEL applies following a successful referendum. So the operative moment here was in 1996. When the voters of Sangamon County elected to apply PTEL. After that point, Section 213 is irrelevant to the Auburn district. Because it is a district that became subject to the law under Section 213. At that point, Section 213's job is done. You then can only look at Section 214 to determine how those limitations might be revoked. And so in both situations, the operative moment is the initial determination of whether PTEL does or does not apply. So you're saying if you have two counties in a district, both have to have the referendum at the same time? For Section 214, is that what you're... 213 or 214. Well, for 213, if you have a district like the Auburn district, that's entirely within one county at the time the referendum is held, that's easy. That's subsection E1 and clearly PTEL applies. If you have, for example, if the Auburn district had been part Sangamon, part Montgomery in 1996, and Sangamon County held a successful referendum, but Montgomery County has not, then after the referendum was held in Sangamon County, the department looks at Auburn district and says, no, PTEL does not apply because at this moment you are a multi-county taxing district. And so until Montgomery County holds a referendum and elects to impose the limitations, you are not subject to PTEL. So there's no simultaneous requirement. There could have been a referendum in Montgomery County. There could be one today. There could, yes. But it wouldn't affect the Auburn district because the Auburn district already is a district that became subject to PTEL. What if, there's the section in 213 about it being the larger county controlling. What if Sangamon weren't the larger county? The first requirement always has to be met, which is that both counties hold a referendum. Then you look at the majority of the EAV. So in this situation, that still would not make a difference. If, for example, the Auburn district were now 52% Montgomery County, 48% Sangamon County, if it is still the Auburn district, the unit community district 10, that same district, it is still subject to PTEL. And the annexation simply takes the district as it finds it, which is that PTEL applies. And I wanted to address Your Honor's question about whether the district can be divided so that Montgomery County would be treated differently, would not be subject, and the portion in Sangamon County would be. We agree with the board that a district, a taxing district, is a taxing district. It either is subject to PTEL or it's not. So there's no division across, that would raise all kinds of conformity problems if the district is either subject to PTEL or it is not. But that strikes me as judicial activism. If we tell the voters in Montgomery County that PTEL applies to them, and they've never had a chance to vote, we have no authority to do that. I disagree, Your Honor. You have authority in the statute. Is there a case? There's no cases. This will be the case. The statute says, though, it's very clear that if a district became subject to the law under Section 213, it remains subject. So the voters in Montgomery County are on notice that this district they're being annexed into is a PTEL district. And there's no judicial activism there. The board's position is that they can write into PTEL a way to revoke it without going to the voters at all, even though there are numerous sections that discuss how you may increase your limit over what PTEL provides for. And there's a Section 214 that provides explicit provisions for revocation. And so it would seem to be more reading something into the law that's not there if you were to adopt the board's interpretation. Was the old De Vernon district covered by PTEL? No. It was partly in Sangamon and partly in Montgomery County. But the majority of it was in Montgomery? Yes. And in any event, regardless, Montgomery had never held a referendum. Right. But I really don't think folks in Montgomery County are going to object to holding their taxes down. They don't even want that renovation under that building. And they can get it. That was the final point I wanted to make, is that the bond that the board needs can be obtained by going to the voters and saying, we have these health concerns. We have these safety concerns. We need to raise money. Please approve it. Let us raise this money. And there's provision for that in Section 190. There's provision for raising the limiting rate. And so it's not as though if PTEL applies, they can't raise that money. They can't. They need to ask the voters. And how many times have those failed? If they make a case for safety concerns, it's a case that needs to be made to the voters. Thank you, Counsel. Thank you. I take this matter under advisement and recess for three short minutes.